Case No. 18-3329, Preterm-Cleveland et al. v. Lance Himes et al. Argument not to exceed 15 minutes per side. Mr. Benjamin Flowers, you may proceed for the appellants. Chief Judge Cullen, and pleased to court, Ben Flowers on behalf of the appellants. We're here seeking very narrow rules. A remand for the district court to at least consider the state interest in supporting Ohio's anti-discrimination law. I'm just going to reference that you do wish to reserve three minutes. Oh yes, I'd rather reserve three minutes, please. We're entitled to that release for two reasons that I'd like to address today. First, there is no absolute right to a pre-viability abortion. And second, the district court may or may not be under a burden test by failing to consider the state interest. Beginning with the first point, there is no absolute right to a pre-viability abortion. That, in fact, follows from Roe and Casey themselves. In Roe, the court applied strict scrutiny to a Texas law prohibiting abortion. Strict scrutiny, of course, entails consideration of state interest. And Roe considered the precise state interest asserted. If there had been an absolute right, there would have been no reason to do that. You just declare the right, nothing fringe, and strike down the law. So there's no absolute right after Roe and Casey, certainly nothing to change that. Indeed, one of the key takeaways from Casey is strict standard of scrutiny was too strict. It was too hard for the states to meet that. And that's why it adopted the under-burden test. Further, the absolute right is inconsistent with Casey's holding. If you'll recall, one of the laws that Casey upheld was a parental consent law. That says that in order for a minor to get an abortion, she had to obtain consent from either a parent or permission through a judicial bypass. But if she could get neither, she wasn't able to get an abortion. Again, that holding is inconsistent with an absolute right. So we know there's no absolute right, and the question is what the district court should do on remand since it improperly found an absolute right. The short answer is that it must, at the very least, consider the state's interest in applying the under-burden standard under Casey. Even under Casey's under-burden standard, state interests are relevant. That is the holding of the Supreme Court. In Hope Women's Health, if you look at pages 19 to 20 of the slip opinion in that case, the court made clear that it must consider the benefits and the burdens of the law when applying the under-burden analysis. And it's critical to consider the state interest at issue here because neither the Supreme Court nor the Sixth Circuit has ever considered that. Let me use an analogy to show why I think that's relevant. If you remember, we looked at Citizens United and the cases that followed. We find all sorts of broad language stating that there's a right to make campaign contributions, to solicit campaign contributions, and the like. But when the question arose in the judicial election context, the Supreme Court, in a case called Williams v. Lee, affirmed before the Supreme Court case upholding a ban on solicitation by judicial candidates. Why did it do that? Because the state interests in those cases were vastly different. It dealt with the state's interest in judicial integrity, the appearance of non-bias. And so the court held, this is an exact quote, our precedents applying the First Amendment to political elections have little bearing on the issues here, end quote. What that illustrates is that different state interests can make all the difference, especially in light of the Holden's health holding, that you have to consider. So you've talked about the different state interests. I want to just sort of hone in on the specific state interest that you argue should be protected here. What is that specific state interest? Does that have a follow-up question for you? Well, I'll be brief and start with the first one, which I think is where the court's going. It's one where the district court erred by finding that we're just talking about potential life. Let me explain why that's wrong. The anti-discrimination interest advances interest not only with respect to children in utero, but with respect to people who have already been born. I think we can all agree that if sex-selective abortion became very common in the United States, as it is in countries like India, which you can see on page 475 of the record, that would be understood to send a signal to a woman that their lives aren't worth as much, a discriminatory signal, and the UN's even said that. Well, the same thing is true with people with Down syndrome. If women are selecting children with Down syndrome for abortion, if doctors are negatively counseling patients to abort their children when they have a Down syndrome diagnosis, the message that sends not only to children or to people who are carrying a child, but to people who are 30 years old, is that if you've got Down syndrome, your life's not worth as much. That is the interest Ohio wants to protect. Now, I take it, Your Honors might say that that interest isn't enough to justify the burden. Well, we don't think the Court should get into that. The point is that it is a distinct interest. The District Court didn't consider it, and I'll read it again. But don't we have to get into that? Because we, right now, as we sit here, we have, as you observed, Roe and Casey. And we have the state of the law that protects a woman's right to have abortion. And it doesn't limit that to say that, okay, if it's for this reason, you can't do it. So wouldn't that pose an undue burden under the state of the law now? It does not, and I can explain why. What Casey said is there is a right to choose an abortion, but the right is not absolutely expressly said. It's a right to be free of an undue burden. So the question is whether this imposes an undue burden. And to make that determination, under Whole Woman's Health, again, pages 19 to 20, with the slip of opinion in that case, you must consider the state-interested issue. But this court doesn't have to do that in the first instance. They can remand it to the District Court to do that. This is a preliminary injunction here. We can do this very quickly. After a remand, I think two weeks, we can brief and be done. So just logically and practically speaking, you're then putting the doctor in the position of interrogating the woman on her personal reasons, her privacy reasons for the medical determination that she's making, correct? No, that he has no obligation to inquire. But how would you know why she wants to have the boy? I think that goes to why it's not an undue burden. If the doctor is not aware of the reason, he can still perform the abortion. He has to certify that he has no awareness of the reason, but he does not have to ask what the reason is. So I think your point is absolutely correct and actually illustrates why we think that in the District Court we'll be able to show it's not an undue burden. But we weren't able to even make that showing because the court improperly held that state interests are irrelevant, that this is a prohibition on abortion. That was another part of the holding below that I'd like to address. What the District Court said is this is a ban on class of abortions. Respectfully, that's not right. My friend's brief in footnote 6 identifies the class of women that they say are affected by this law. They say any woman who receives a diagnosis of Down syndrome while carrying her child. Well, if that's correct, all of those women, every single one of them, can still get an abortion of the very same pregnancy for any other reason. What this law does is it takes one reason off the table. Just like the ban that the court upheld when Gonzales v. Carhart took one method off the table. It's not a ban on abortion. It's a regulation of abortion. Now, again, the court may determine on remand if that's an undue burden. We'll litigate that there. We're not asking for the court to resolve that here. All that we're seeking is a remand so that we can have our day in court because what the court effectively did was issue a de facto judgment on the pleadings. There'll be nothing left to do when we go back to the District Court. Well, you know, this may not really be a specific argument, but I'm confused because if the doctor doesn't have to ask and the woman doesn't have to disclose, how – and, of course, she has a right to have an abortion under Roe v. Wade. What interest of the state would supersede her decision and why do you need this extra regulatory mechanism? Sure. Well, we dispute that she has the right to have this abortion for this reason. She certainly has the right to get an abortion. I mean, but the reason's on the Roe. No, well, but – And this is pre-violated we're talking about, correct? Correct. But let me illustrate again with Casey why it's the interest to make a difference. Again, that parental consent law that the court upheld, it did not really go into the reasons for upholding in sight of the case called Biladi-Bear. That's the case that lays out the justification for parental consent laws. What it says, the reason you can impose those sorts of requirements on a minor that you certainly couldn't impose on an adult, the court says for two unique state interests, the welfare of minors and encouraging parents to be involved in important decisions that their children make. So, again, the state interests make all the difference. That makes a law that would otherwise be an undue burden not an undue burden because of the benefits that whole woman's health requires be considered. Okay. So if we were to find that Roe and Casey created an absolute right to pre-viability abortions so as to preclude all possible state interests, would that go against the existing body of precedence? That would contradict Casey because, again, Casey upheld the law that – they upheld the parental consent law, which did, because of unique state interests, allow a ban on the class of a woman from getting a pre-viability abortion, namely minors who could obtain either parental consent or permission to do judicial bypass. We think that this is not only – So you say that Casey limited Roe? Casey expressed a limited Roe because it said the district's cruelty standard was too high. In addition to that, though, we think that our rule, what we're asking for, and by this I mean the remand to the district court, is not only consistent with Roe – or with Casey, rather. It's compelled by Casey, particularly in light, again, for your honors to slip, page 19 to 20 of the slip opinion, a whole woman's health, makes absolutely clear that courts must consider the benefits that a law imposes in deciding whether it's – whether the burden is undue. How has the state's argument impacted by the Seventh Circuit's decision in Planned Parenthood of Indiana? Would we be creating a conflict in the circuit if we were to accept your honor? You would, your honor, but I think that's why we have various circuits throughout the country. Sometimes one circuit gets it wrong and that doesn't bind the rest of the country. I would refer your honor to Judge Easterbrook's dissent from denial in that case, where he addresses this. Now, Indiana actually didn't seek unmarked review on that particular issue. They have sought certiorari, and the case has been pending there for quite a few weeks, so the court has apparently decided what to do with it. So your view is that the Seventh Circuit got it wrong, and this is a conflict that we should create by virtue of our decision? Absolutely. And I will note, though, there's going to be a certain split either way, because in the Eighth Circuit, in a case called Comprehensive Health v. Hawley, now it wasn't an anti-discrimination law. No court other than the Seventh Circuit has addressed these. But that court said that the undue burden analysis is so fact-bound, particularly in light of Hope Woman's health, that courts must engage in fact-finding and weigh the state's interests when applying the undue burden analysis. So I don't think it's possible to avoid a circuit split. And even if it were possible, I would just again refer your honors to Judge Easterbrook's dissent from denial where he said, Using abortion to promote eugenic goals is a morally and prudentially debatable on grounds different from those that underlay the statutes Casey considered. And so Casey simply doesn't resolve the question. We're not asking your honors to resolve that question. We think this is a court of review, not first view, but it would be proper to let the district court do it in the first instance. Unless there are further questions, I'd like to reserve the remainder of my time for a while. Thank you. May it please the Court. My name is Jessie Lill. I represent the plaintiffs. After voting to pass a six-week abortion ban, a 20-week abortion ban, and a ban on federal funding for Planned Parenthood, at the end of 2017, the Ohio General Assembly passed HB 214, which criminalizes abortion if any part of the woman's decision to end the pregnancy is related to a diagnosis of Down syndrome. The district court correctly held that HB 214 contravenes long-standing, unambiguous, and binding precedent, holding that before viability, the ultimate decision whether to terminate a pregnancy belongs to the woman alone. Well, just a comment. The appellant says that there is no inquiry required for anybody to determine whether or not that's the woman's reason. It's only if there is some incidental knowledge, I suppose, that that's the reason. And so, did that impose a new burden? I suppose you disagree with that. Correct. We disagree, Your Honor. First of all, the law does not impose an inquiry requirement. However, the evidence in the record indicates that the doctors often, if not almost always, know when this is the case because of how these patients come to them. They are generally referred after counseling and meeting with an internal fetal medicine specialist, for example. But even if doctors didn't know or could somehow avoid knowing, it doesn't change the fact that HB 214 is a pre-viability abortion ban. It doesn't change what the law says. And this is the one thing that Casey has been extremely clear about and expressed in categorical terms, is that under no conditions can the state, no interest of the state, can justify taking the ultimate decision whether to have an abortion away from a woman before viability. And the reason for this holding, as the district court recognized, is that the right to make such a fundamental personal decision autonomously and without state coercion is the very core of the privacy right recognized in Roe and Casey. Here, the record demonstrates that women in Ohio make the decision to terminate a pregnancy for a wide variety of reasons, familial, personal, medical reasons. The essential premise of the state's argument, that the state is entitled to pick and choose the reasons it deems appropriate for a woman to end a pregnancy, is just fundamentally incompatible with this binding precedent, with the very concept of a right to autonomous decision-making about a woman's pregnancy. So, we think that the district court's decision should be affirmed first because the right to make the ultimate decision, again, is a categorical one. It's not an absolute one, and I want to address that point in the sense that the state is saying that. So, we don't mean that when we say the right is categorical, we mean that the Supreme Court has been extremely clear that this is at the very core of the privacy right, that this is one line that the state cannot cross, is to take the ultimate decision away from the woman. It can encourage women, it can inform women, it can persuade women. It cannot take the ultimate decision away from the woman. It does not mean... Is it your argument that Roe and Casey created an absolute right to pre-violate abortion, such that no possible... that would preclude any possible state-alleged state interest? We are not saying that the right is immune in the sense that it can't be regulated. Of course, there are all kinds of constitutional regulations and restrictions on abortion. We're saying that there is no state interest out there that can justify a ban, an actual ban on abortion like this one. And the court was extremely clear in Planned Parenthood v. Casey about this fact, and I'll just quote some language. The court said, A statute while furthering the interest in potential life or some other valid interest that has the effect of placing a substantial obstacle in the path of a woman's choice cannot be considered a permissible means of serving its legitimate ends. That's Casey at 877. Casey said, The state cannot prohibit any woman from making the ultimate decision to terminate her pregnancy. Now, again, it can impose restrictions, regulations to advance valid, legitimate interests, but it cannot actually take the final decision whether to have an abortion away from a woman, and that is exactly what HB 214 is doing. So if we find that the state's interest falls outside of Roe and Casey, under a strict scrutiny standard, do you lose? We do not lose under any standard. We win even under strict scrutiny. We do not believe strict scrutiny is the correct standard here. However, we would also win under that standard because, first of all, forced childbearing is not a narrowly tailored way to advance an interest in non-discrimination, in preventing discrimination. I mean, first of all, I have to point out that the state did not even address the point of narrow tailoring under the strict scrutiny standard until its reply brief and has therefore waived any argument on that point. But even if that argument were not waived, under a strict scrutiny analysis, the state cannot say that it has this interest in non-discrimination, and then the first thing it does is to go restrict a woman's right, constitutional right, to make childbearing decisions. The state must consider less restrictive alternatives of the woman's right, and the state has not shown that it has done so. And that is the burden on the state, not on us. The state has to show that it has considered alternatives, that other alternatives would not work. Similarly, the state cannot show that this law advances compelling interest at all. Even if the anti-discrimination interest relied on by the state here is compelling in this context, there is absolutely no evidence on this record that women are making decisions to end pregnancies after a Down syndrome diagnosis for reasons that are invidiously discriminatory, that women are motivated by discrimination when they make this decision. On the contrary, again, all the evidence in the record that actually relates to Ohio and to women in Ohio shows that women make decisions for many different reasons, often many interrelated reasons at once. So if a woman decides she loses her job, she loses her health insurance, she has two children already, and then learns that the fetus she's carrying has a diagnosis of Down syndrome and she cannot bring that pregnancy to term and support a child with special needs, that is not discrimination, but that decision would be forbidden by HB 214. And that's exactly what the Court is talking about in case when it says the ultimate decision belongs to the woman alone. It is deeply problematic to assume, as the state does here, that these considered private decisions about such fundamental matters are motivated by invidious discriminatory intent. For all of the information the state has put in the record, talking about, you know, often frankly ignorant and demeaning views about Down syndrome from the sources that refer to places like Iceland and the Netherlands and the UK, you know, none of that can be imputed to the Ohio women who are making these very personal and sometimes difficult decisions about their pregnancies. I just want to also address the state's point about parental consent laws. It's true that the Supreme Court has upheld, based on different interests, parental consent laws as applied to minor women. I first want to say that the rules that apply to minor women are not necessarily the same rules that apply to adult women. But I would like to add something. This is, again, this is not a ban. Biladi is not instituting a ban on women under 18 having abortions. It is imposing a procedural requirement that they notify or get consent of their, or allowing a procedural requirement to go forward, that they notify or get consent of a parent or get a judicial bypass order. The court, in fact, has made it very clear, starting with Planned Parenthood v. Danforth in 1976, and throughout in subsequent cases dealing with parental consent requirements, that no one, not the state, not the parent, can impose an absolute veto on the minor making this decision for herself. I do want you, before you take your seat, I want you to comment on this requirement of Section 2919-101, which requires the performing physician to attest in writing that he or she is not aware that fetal down syndrome is a reason for a woman's decision to terminate, and how that relates to or conflicts with privacy consideration and norms that govern these issues. Well, right, Your Honor. On the one hand, you know, the state does have to, under that provision, sorry, the doctor does have to certify that she or he does not have knowledge that down syndrome is a reason, a reason, not the only reason, not the principal reason, a reason for the woman's abortion. Now, does that in its terms require the doctor to inquire as to the reasons? It does not on its face, but the definition of what knowledge is under Ohio law, and it's cited in our brief as well, is very broad and includes conduct that would involve, you know, failing to make inquiry or acting with a conscious purpose to avoid learning a fact. So the doctor can't simply close his or her ears to what they might hear during counseling, to what appears on the patient's medical records when the patient comes with a referral to the clinic, which is how many of these patients come. And again, that is in our plaintiff's declarations in the record below, that they know that in at least some cases the woman is being referred because of a down syndrome diagnosis. So, and again, none of this changes the fact that this law is a ban. So that the state wants to now say that the doctors can somehow avoid this fact or ignore this fact does not answer the fact that this law takes abortion off limits for a particular set of women because of the reason why they are choosing abortion. I do want to make one other point, and although the state has not focused on this argument, here it is in the state's brief, is the idea that women might be coerced or pressured into choosing abortion after a diagnosis of down syndrome, and that the state somehow has an interest in avoiding that as well. Again, there is no evidence that any woman in Ohio has been pressured to choose abortion after a diagnosis or as a result of a diagnosis of down syndrome. In fact, all the record evidence indicates and the declarations indicate that women are making voluntary and well-informed decisions about their pregnancy, that they receive counseling, that they receive information that is mandated by the state of Ohio about down syndrome. And in fact, the only coercion on this record is by the state of Ohio itself, which is forcing women to carry it to term when they may not wish to do so. So even if there is a concern about some women being coerced, which again, there is no evidence, but if the state is concerned about some women being coerced or pressured into making one particular procreative choice, the answer is not to turn around and coerce their procreative choices in the other direction. So again, that just goes to show how this law is not in any version of strict scrutiny a narrowly tailored response to an interest in discrimination or any of the other interests that the state has identified. It's not a narrowly tailored response to an interest in promoting the ethics and integrity of the medical profession, certainly to the extent that it likely hampers or might be designed, Judge Donald, as you were suggesting earlier, to hamper communication between doctors and patients, to hinder open and honest communication about why the patient is seeking the abortion. That is not in line with medical ethics and integrity. It may force doctors to turn away women who have medical indications for terminating a pregnancy. That does not support the ethics and integrity of the medical profession, and it forces doctors to deny women their autonomy. Finally, I just want to note that we acknowledge that the undue burden test, especially as understood in Whole Woman's Health v. Hellerstedt, does require a balancing of burdens and benefits, but the part that the state keeps leaving out of its analysis here is the burden part. It is the burden on access, and when you have a ban, an absolute flat-out ban, whether it's for all women or for one class of women, pre-viability, that creates an absolute obstacle, not just a substantial obstacle. That prevents accessing abortion entirely. So that's why the court has repeatedly said in Casey that no interest can justify a ban. When you're talking about an interest versus some sort of restriction that may hamper access or make access more difficult, then you need to do a more careful balancing. But when it's an outright ban, that is an absolute obstacle, not just a substantial one, and therefore cannot survive under the undue burden test either. And that is really what the undue burden test does. That's why we have the undue burden test. It is a way of answering that question that Casey said is the central premise of Roe, the central principle of Roe that it was retaining, that no woman can be denied the right to make the ultimate decision, and the state cannot block any woman from making the ultimate decision whether or not to terminate a pregnancy. And if there are no other questions, for all these reasons, the plaintiffs respectfully urge this court to affirm the preliminary injunction. Thank you. Okay, thank you. So I want to quickly address three categories of issues. First, a couple of factual points. Second, some legal points. And third, a consequential point. First, when it comes to the factual stuff and the evidence, they say that we suggest women have invidious motives. That's not the point at all. Whatever their motives are, if they're singling out one group of people for an abortion, that sends a discriminatory message. Second, they consistently refer to the record. We haven't had a chance to develop the record because it's just a preliminary injunction proceeding. Certainly, there are experts and people they've been able to testify have not been subjected to cross-examination. But you had to have enough evidence to overcome the likelihood of success on the merits? And I'm glad you asked that because that's the next point I want to get to. Under Missouri, the burden is not ours. The burden is theirs to show that they're entitled to a preliminary injunction. That is an abortion case from the United States Supreme Court, 520 U.S., to page 972. Okay, but the district court found that they satisfied that. But it didn't consider the state interest, so it didn't conduct the correct analysis. That brings me to the second point, the legal categories. I think they've conceded much of what we're trying to do here. The court has to consider the state interest in applying a new burden. My friend on the other side says, well, parental consent laws are different because the state interests are different. Exactly. When state interests change, the analysis changes. They have no response to our point that this isn't a ban, as we explained. The same woman can get the same abortion for any other reason. Indeed, they say that women generally have many reasons. And as long as they – even if they initially have this reason and then change their mind and decide to do it for another reason, they are free to do that under this statute. And finally, I want to – But the statute talks about a reason. So if this is a reason amongst a basket of other reasons, then it would violate H.B. 214, wouldn't it? True, but the fact that you begin with a reason does not mean you conclude with it and you can decide to do something for another reason. There may be overdetermination. To use an illustration that we're familiar with as lawyers, if I'm writing a brief and an associate comes to me and says, you should rely on this case. Suppose I'm representing someone at that time and I want to rely on a circuit-level case. And I say, I decided we're right for two reasons. Number one, the Supreme Court case. Number one, the circuit-level case. And then the associate says, well, actually, the Supreme Court said you can't rely on circuit-level cases. I say, fine. The other reason is reason enough for me to do it. I'll disavow that reason. That's going from disavowing a reason moving to another one that already gets the job done. Briefly, I want to make the consequential point. If my friends on the other side are right, the state would be powerless to ban sex-selective abortions, race-selective abortions, or any other disability-selective abortion. It is sadly not that long ago in this country that doctors and elite medical institutions were promoting the extermination of the feeble-minded, of races that they deemed not desirable. And that's happening in other parts of Europe. We're not asking this court to balance the interest and find out if this law is justified. All that we're asking to do is to have our day in court before the law is preliminarily adjoined to show that state interests they concede are relevant under undue burden analysis are considered before adjoining the law. Unless there are further questions, we ask that you reverse and remand for further proceedings. Okay. Thank you, counsel, for your arguments this morning. The case will be submitted to the Attorney General and the clerk will call the next case.